## ESLINGER v. WESTERN & ATLANTIC R. R. CO.

*Simmons, C. J.*—The plaintiff's evidence made no stronger case at
the last trial than at the trial under review when the case was
before this court at the March term, 1895. It was then held that
she was not entitled to a recovery, and consequently there was
no error at the next hearing in granting a nonsuit. The
amendment to the declaration alleging an additional ground of
negligence against the defendant was not sufficiently supported
by evidence to authorize a recovery on that ground.

*Judgment affirmed.*

*Atkinson, J.,* dissenting.—There was evidence to require the sub-
mission of the issues of fact in the case to a jury.

August 24, 1896.

Action for damages. Before Judge Milner. Whitfield
superior court. October term, 1895.

Mrs. Eslinger sued the railroad company for damages
because of the killing of her husband. Her declaration al-
leged in brief: On June 4, 1892, and for some time pre-
vious, her husband was employed by defendant as car-
coupler in its yard in Atlanta. On June 4th, 1892, with-
out negligence on his part, but because of the gross care-
lessness of defendant, he was killed while in the discharge
of his duty as coupler in said yard. He worked at night,
and had been so employed since his connection with de-
fendant. On said date he came on duty as usual, and pro-
ceeded to perform the duties assigned to him. At a point
about twenty-five yards north of defendant's depot is a side-
track upon which cars are placed at a transfer-shed. This
track runs north and south, passes by the depot, and con-
nects with a series of tracks south of the depot. Some few
feet south of said transfer-shed, the space between the rails
of this side-track had been floored with heavy oak plank,
fastened so as to leave no space between the planks except
near the rails on the inside of the rails, for the flange of the
car-wheels to run in, but entirely too wide for this purpose.
Ordinary care required defendant to see that this flooring

was properly done. A few feet south of the point where her husband was killed, these planks had been sawed off square at the ends; some of them were longer than others; from the top of the planks where they had been sawed off to the ties upon which the plank were fastened left a fall or step-off of three or four inches. Some time during the day of said June 4th, cars had been left upon this track, and the south end of the car furthest south was stopped a few inches south of and beyond the point where the plank were sawed off, so that the ends of these plank extended up a short distance under this car. About eight or nine o'clock on the night of June 4th, 1892, the duties of her husband called him to couple this car to others attached to the switch-engine. As the last named cars came back he went in to make the coupling, which he succeeded in doing. The momentum with which the cars came back against the stationary car, forced [it] beyond the point where the ends of the plank were, while he was between the cars. The step-off at the end of the plank caused him to lose his footing and fall, and before he could extricate himself the cars passed over him, killing him. He went in to make the coupling from the west side of the cars. The brake-beam upon the moving car which was next to and approaching the stationary car, and to which he was to couple, had a bolt sticking out through the beam, the point of which extended through and beyond the beam three or four inches, in the direction where he had to stand to make the coupling. This bolt was exposed and had no tap on it; and from the position in which his body was found, this bolt, or the space between the plank and the rail above described, must have caught and held his feet and legs, as his head was in the direction of the engine and in the opposite direction from that in which the engine and cars were moving. Having and leaving said space between the rails and plank, it was gross carelessness to have said bolt in the place it was, exposed and sticking out as it was, without a tap on it. It

was gross carelessness on the part of defendant to leave the ends of the plank sawed off and in the condition in which they were. Ordinary prudence required that the ends of the plank should have been sloped or beveled, or that dirt be packed at the ends and sloped, thus furnishing him a reasonably safe place in which to perform the duties assigned him, as in law it was bound to do. The brake-beam was too low; if it had been of the proper and usual height, after he was caught and caused to fall it would have passed over him, but it was so low as to catch and strip his clothing up over his head. Because he worked at night he had no knowledge of the condition of the plank, brake-beam and bolt, and thus when killed was in the strict line of his duty and without fault or negligence. By amendment it is alleged, that the reason why the brake-beam was too low was, that a nut on top of a rod which ran through the brake-beam to hold it up was loose, and had by moving down on the bolt caused the beam to come down too low; and that the usual, proper and ordinary height of a brake-beam is eight inches above the rail, while the brake-beam on the car that passed over Eslinger was but four inches above the rail.

A former trial of the case resulted in a verdict for the plaintiff, and a judgment refusing to set aside the same was reversed by this court. 95 *Ga.* 734. The amendment just referred to was made at the last trial; and upon the introduction of the evidence for the plaintiff a nonsuit was granted, to which ruling she excepted.

The evidence shows the following: Eslinger was killed about 7 o'clock at night in June, 1892. His cheek was crushed in. He was found lying with his cheek next to the rail, and his feet were lying north somewhat diagonally along the track, or across the track. No part of the machinery of the car was resting on his body. His face was lying close enough to the rail for the flange of the wheel to have made the wound on his face. The track between the

rails where his body was lying was a smooth place floored in with plank. Witness Torrence testified that, to the best of his recollection, all of the body was resting on the plank. Some of the planks are longer than others. The body was lying on the planks between the rails. Torrence would guess that six or eight or ten inches of Eslinger's legs were extending over the ends of the planks; thinks there was about four or five feet of the plank extending under the stationary car before it was moved; did not measure. After the cars were hit they moved four and a half or five feet, and when they stopped they were right about the end of the planks. Torrence thinks the car was right about even with the end of the planks, or may be a few inches north of them. The planks are about two inches thick. Interrogatories of Torrence were taken about two or three months after the accident; his mind was then much fresher about the accident than it is now. He then swore, that the stationary car which Eslinger went in to couple was standing about two and a half or three feet over the floor, that is, the end of the floor extended under the car about two and a half or three feet; and that the other stationary car was not over any of the floor at all. In answer to the question, whether that testimony is the truth, he says that the end of the box-car next to the engine was not over the floor. Q. "The one north of the plank?" A. "They was when they hit." The stationary car that Eslinger went in to couple was standing two and a half or three feet over the plank. The first person to get to him after he was killed was Say. When Torrence saw him the distance of his head from the end of the floor was about three feet; his head was south and his feet were north. The cars moved about four or five feet after they came together; in going this distance they would have to pass over the end of the plank floor. Torrence was about a car-length and a half from Eslinger when he went in to couple the cars, which were from 30 to 34 feet in length. The first thing that attracted the atten-

tion of Torrence was the lamp falling out that hit the ground, and the next thing was Eslinger halloing, "Oh, Lordy." Just as the cars came together the lamp fell out; he halloed pretty close after. Torrence cannot give any idea as to how many seconds after the cars came together before Eslinger halloed; does not know how long it was between the time the lamp fell out and the time he halloed; swore in the interrogatories that "time elapsing being about four or five seconds when he was killed from the time he went between the cars"; never timed it, and did not know for certain whether there were four or five seconds. The cars were moving back very slowly to the stationary car, and he went in to make the coupling, and just as the cars came together his lamp fell out and he halloed, and Torrence gave the engineer a distress or immediate stop signal, and he stopped. Torrence ran by the engine and told the engineer that Eslinger was killed, and ran around the engine and told those in the office and came right back. From the time he went between the cars to the time he was killed was very short. What Torrence said in his interrogatories must have been as nearly right as he could have gotten it. If he went in about two or three feet from the end of the plank, he went on a perfectly smooth and level place. Torrence does not know what was there to make him fall. If the stationary car was up over the end of the planks, and he had to step off the planks, it would be some rougher than on the planks. They are about two inches thick. The lamp falling out and the halloing were not exactly at the same time; the latter was "right on top" of the former. The cars were barely moving at the time of the coupling. Torrence examined the machinery of the cars after the accident two or three hours; the brake-beam was in good order; he saw nothing wrong about it; it was about eight inches from the floor. The plank was bevelled off close to the rail, leaving a space for the wheels to run in, which space was too wide to catch a foot. The place is now

just as it was at the time of the accident. There was a rod that projected from the center of the brake-beam and right under the draw-head, that could not have caught Eslinger unless he had got right between the draw-heads, which would have been a dangerous position if the cars came together. He could not have been caught by the bolt in the center of the brake-beam if he was in a standing position between the cars; he would have had to be in a reclining position, leaning pretty far back, for the bolt to have caught him. To have made the coupling properly, he would not have had to be closer than 18 or 20 inches of the rod or bolt in the brake-beam. In going in to make the coupling, the coupler follows the moving car after the cars hit. There is no absolute necessity to go between the rails to make the coupling; he can stand on the outside and enter the link and pin, and that is all to be done. The car was moving very slowly; it stopped within four or five feet after the coupling was made. It was made successfully. Torrence does not know whether it was made before the lamp fell out or not; the lamp fell out about the time the car was hit; guesses Eslinger made the coupling before he halloed; he made it about the time he halloed. The place for the flange of the wheels to run in the floor was wider than was necessary. Torrence put his foot down in that place four or five different times. There was nothing where Eslinger went in to make the coupling to cause him to fall; it is a smooth, safe place. He had been coupling cars over this place two months, at different times, along that track and over that place; this was one of the most used tracks in the yard. Torrence has never known an accident to occur at that place before or since this one. The condition of the place has remained unchanged. Eslinger's work was done at night. There was nothing to prevent the superintendent and yardmaster from seeing the place.

From the testimony of Addington, it appears that he was about 100 yards away at the time of the homicide, and

went immediately to the place. He with several others looked at the brake-beam of the car under which Eslinger was killed. The beam was hanging very low, witness thinks not over four inches from the plank. He turned a tap on bolt that holds the brake-beam; had no trouble to move the bolt; if it had been tightened up, he could not have moved it, and it would have raised the brake-beam two inches higher. The usual and ordinary height of a brake-beam is eight inches. Witness had never seen one that low before. It would pitch a man forward if he was in there and his foot caught on the planks. In stepping partly on the plank and partly off them, the low brake-beam would catch a person on the leg. Witness has been caught that way. He assisted in taking Eslinger from under the car; his head looked as if the flange of a wheel had run over it; did not notice any bruises on any other part of his person; his vest was pulled up over his head; did not notice where the brake-beam or any part of it caught his clothing; there was no blood on the ground and rail where he was lying. The brake-beam was four inches from the rail and four from the ground, which would make it eight inches from the ground, but for the plank which were up within an inch or a half-inch from level with the top of the rail. These are estimates: witness did not measure. The plank were two or three inches thick; the step-off from their ends would not exceed three inches. Witness does not know that for the brake-beam to strike Eslinger he must have been leaning toward it and not in a standing attitude. The brake-beam is under the body of the car and under the bumper. It is about three feet from the brake-beam to where the link is, when you go to make coupling. For a man to put a link in a bumper, he would be three feet from the brake-beam, but his feet would not be that far. He could get his foot caught by walking along when the cars come together; he has got to keep them out of the way of the brake-beam, or it will catch him every time. If he

keeps his foot up level with his body, then the brake-beam will not catch him.    Q. "Only way for the brake-beam to catch him is for his foot to get back under the bumper?" A. "Unless it would be in a case of this kind."

John Byrd as an expert testified, among other things, that it is from four to six or eight inches from the bottom of the brake-beam to the ground.    He thinks a brake-beam four inches high would be more likely to catch a brakeman than one eight inches high; four inches is not enough space in there to let his foot out in case it should get hung, while one eight inches high has enough room to get his foot out and get out of the way, if one with beam four inches high would hang him and drag him under the car; that has been his experience.    If a coupler went in to couple a car standing stationary, with the planks extending two or three feet under the end of it, and the place is smooth, witness does not know what would cause him to fall.

The engineer of the train which did the killing testified: I do not think it was over a minute after the accident before I reached the place.    Eslinger's head was turned toward the engine when I got to him; his head was about two or three feet from the end of the plank.    From the point where he went in to make the coupling to where his body was found, he would have had to pass over the end of the plank in some way.    I do not know how he got over the end of the planks; he could have been dragged over this step-off.    I think the plank are two and a half inches thick, and it is down grade there, and cinders and sand and dirt have washed in there until it is nearly level; it could not have been more than an inch step-off.    It was a public crossing, and had been so planked two or three months.    It is now in about the same condition as it was on the night of the accident; the step-off is just as it was when the crossing was completed.    I think Eslinger had been coupling for two or three months.    We coupled over this track every night.    There is no chance for him to get his foot caught

in the place where the flange of the wheel runs; it is too
wide; the planks are bevelled off for the flange to run in. I
made a careful examination of the brake-beam that night,
to see if I could find anything wrong with it. I found
nothing wrong. I looked to see if I could see any signs of
where his foot had been caught, but found nothing. I
never measured it, but suppose the brake-beam was about
seven or eight inches high. I never saw anything wrong
with any part of it; beam was in good condition and seemed
to be hung right. I saw no nuts or bolts projecting from it.
The brake-rod goes through the beam right under the
draw-head. To have been caught by the bolt on the brake-
beam, he would have to be right square under the bumper.
I do not think the nut was off. I could find no place where
he could have been caught. The bolt that comes through
the brake-shoe does not affect the height of the beam. The
only way to change the height of the beam is to take it
down and change the length of the hanger rods. The
bolts on the end of the beam have nothing to do with the
height of the beam; they are put there to hold the brake-
shoes on. I looked to see what could have caused the acci-
dent, and could not find a thing. I saw no evidence of his
having been dragged over the planks. When this coupling
was made I was coming back very slowly, barely moving;
had my hand on air-brake throttle, and when Torrence sig-
naled me down I stopped at once. I think the train moved
about five feet after he gave me the signal. I was looking
right at him when he gave it. He cut me down as soon as
I felt the jar of the cars coming together. I cannot under-
stand how Eslinger's head came to be turned toward the en-
gine.

The witness last referred to further testified that Eslinger
had told him he had a weak ankle; and that on two occa-
sions his ankle had given way under him as he attempted to
step on the foot-board of the engine witness was driving,
and came near being injured. Witness advised him to quit

the job he held and get another, and he said he thought he would. There was testimony by plaintiff and two other witnesses who had long known Eslinger, that they never saw or heard of any weakness in this respect; that they were frequently with him, and he was rather an active man, etc.

*Maddox & Starr*, for plaintiff.

*Payne & Tye* and *R. J. & J. McCamy*, for defendant.